

**SIGNED this 09 day of November, 2010.**

_____
**John C. Cook**
**UNITED STATES BANKRUPTCY JUDGE**

_____

# IN THE UNITED STATES BANKRUPTCY COURT FOR
# THE EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **McKenzie Financial Center LLC** | ) | **No. 08-16988** |
| | ) | **Chapter 7** |
| **Debtor** | ) | |
| | ) | |
| **Western Surety Company** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | **Adv. No. 09-1025** |
| | ) | |
| **Regions Bank** | ) | |
| | ) | |
| **Defendant** | ) | |

## M E M O R A N D U M

This adversary proceeding is before the court on cross-motions for summary judgment. Plaintiff Western Surety Company, as the assignee of a general contractor, claims to be a third party beneficiary of a construction financing contract between defendant Regions Bank and the debtor, McKenzie Financial Center LLC. According to Western Surety, Regions Bank breached its financ-

ing contract with the debtor by exercising purported setoff rights against retainage (or hold-back) funds rather than disbursing them to the debtor for payment to Western Surety. Regions Bank contends that Western Surety is not a third party beneficiary and no breach occurred. The bank also claims that, since the general contractor did not remain licensed throughout the entire construction project, any contract claim is barred under Tennessee law.

This is a noncore proceeding that is related a case under title 11. The parties have consented to this court entering a final judgment subject to review under 28 U.S.C. § 158 in accordance with 28 U.S.C. § 157(c)(2).

**I.**

The parties have each filed statements of undisputed material facts, responses thereto, various exhibits, and affidavits. Having reviewed the record, the following facts appear to be undisputed.

In May 2005, the debtor contracted with a general contractor, C & I Specialty Co., Inc., to build an office building in Cleveland, Tennessee. Under the terms of this contract, the debtor agreed to pay the contractor a fee of $5,232,400 for the construction. On August 9, 2005, the plaintiff issued payment and performance bonds to guarantee the contractor's obligations under the construction contract.

In September 2005, the debtor and Steven A. McKenzie, as guarantor, contracted with AmSouth Bank, predecessor in interest to defendant Regions Bank, to finance the construction of the office building, the bank agreeing to lend the debtor up to $5,285.000. The bank initially advanced the debtor $4,640,000, and the debtor executed a Term Promissory Note in favor of the bank with a maturity date of March 12, 2007, which was secured by a deed of trust to the real estate comprising the construction project. The financing contract also contained the following provision,

2

which granted the bank a lien and security interest in all amounts in its control or possession on account of the debtor to secure and offset any obligations owed by the debtor to the bank:

**Section 8.19**

<u>Liens: Setoff by Bank</u>. Borrower hereby grants to the Bank a continuing lien, as security for the Note and all other indebtednesses of the Borrower to the Bank, upon any and all of its moneys, securities and other property and the proceeds thereof, now or hereafter held ore received by or in transit to, the Bank from or for the Borrower, and also upon any and all deposits (general or special, matured or unmatured, including, but not limited to, the construction checking account with the Bank for this loan) and credits of the Borrower against the Bank, at any time existing. Upon the occurrence of any Event of Default as specified above, the Bank is hereby authorized at any time and from time to time, without notice to Borrower, to set off, appropriate, and apply any and all items hereinabove referred to against any or all indebtedness of the Borrower to the Bank.

The financing contract required the debtor to make requests for loan disbursements and required the bank, after inspecting the construction progress, to disburse amounts equal to 90% of the costs of the construction progress completed. This 10% difference between the amount of the cost of completed construction and the amount of the advance request is referred to as "retainage" in the financing contract. Before draws would be disbursed, the following, among other things, must have occurred:

- No Event of Default nor any event which with notice, lapse of time or both would constitute an Event of Default.

- All warranties and representations contained in the Loan Documents remained true and correct as of the date of the advance.

- Construction of the Improvements certified by the Project Architect and approved by the bank's inspector.

- No material adverse change in the financial condition of the borrower or the guarantor that would, in the reasonable judgment of the bank, prevent the borrower or the guarantor from fulfilling their obligations.

- Subject to the retainage requirements of the Construction Contract and subcontracts, all bills and invoices which served as the basis for prior disbursements must have been paid.

- Prior to the final disbursement, the bank shall also have received:

    1. evidence of the proper filing of a Notice of Completion;

    2. evidence that no notice of lien has been filed; and

    3. other reasonable documents and items requested by the bank.

Under Section 7.1 of the financing contract, Events of Default included the following:

- The failure of the borrower to pay, when due, principal or interest on the loan or other amounts due under the financing contract.

- The failure of the borrower to pay the loan or the note when such has matured.

- The insolvency (as defined by the Uniform Commercial Code) or bankruptcy of the borrower or any guarantor.

- The failure of the borrower or the guarantor to pay any indebtedness due to the bank or default under any other indebtedness due to bank.

- The failure of the borrower to generally pay its debts as such debts become due.

- The failure of the borrower to pay any indebtedness within 10 days of being due.

- Any material adverse change in the business, operations, property, condition (financial or otherwise) or prospects of the borrower, which, in the bank's reasonable determination, constitutes an impairment of borrower's ability to perform its obligations under the Loan Documents or constitutes a material impairment of or otherwise materially affects the value of the project.

- The occurrence of any condition which, in the bank's reasonable determination, constitutes an impairment of the borrower's ability to perform its obligations under the Loan Documents or constitutes a material impairment of or otherwise materially affects the value of the project.

- Any default in the "McKenzie Mobile Home Sales & Rental Loan" or the occurrence of an "Event of Default" under the McKenzie Mobile Home Sales & Rental Loan Agreement".

Other pertinent provisions of the financing contract are as follows:

4

### Section 2.3

[P]rovided that Borrower . . . shall be in full compliance with all applicable provisions of the Loan Documents, Bank shall disburse the proceeds of the Loan in proportion to the progress of construction for work completed . . . .

### Section 3.2

Bank shall not be obligated to make any disbursement of Loan proceeds unless . . . (d) There shall have occurred no Event of Default nor any event or circumstance which with notice, lapse of time or both would constitute an Event of Default.

### Section 4.5

Inspections by Bank. . . . Bank shall have no liability or obligation whatsoever in connection with the Improvements or the construction or completion thereof or the work performed thereon. Bank shall not be obligated to inspect the Improvements, such inspections being for Bank's own benefit, and not for the benefit of Borrower or any other person. Bank shall not be liable for the performance or default of an contractor or subcontractor, for any failure to construct, complete, protect or insure the Improvements, for payment of any cost or expense incurred in connection therewith, or for the performance or nonperformance of any obligation of Borrower to Bank . . . .

### Section 7.2

Suspension of Construction Advances. Upon the occurrence of an Event of Default or of any event, circumstance or condition which with notice, lapse of time or both would constitute an Event of Default, the Bank shall be relieved of any obligation to make any further advances of Loan proceeds under this Agreement.

### Section 8.2

No waiver; Remedies.  No advance of Loan proceeds hereunder shall constitute a waiver of any of the conditions of Bank's obligation to make further advances, nor, in the event Borrower is unable to satisfy any such condition, shall any such waiver have the effect of precluding Bank from thereafter declaring such inability to be an Event of Default as herein provided. No waiver of any default or breach by Borrower or Guarantor hereunder shall be implied from any omission by Bank to take action on account of such default. No express waiver shall affect any default other than the default specified in the waiver, and it shall be operative only for the time and to the extent therein stated. Waivers of any covenant, term or condition contained herein shall not be construed as a waiver of any subsequent breach of the same covenant, term or condition. The consent or approval by Bank to or of any act by Borrower or Guarantor requiring further consent or approval shall not be deemed to waive or

render unnecessary the consent or approval to or of any subsequent similar act. Parts of the whole of any advance may be disbursed before or after it becomes due hereunder if the Borrower and the Bank believe it advisable to do so, and any such disbursement shall be deemed to be made pursuant to this Agreement and not in modification thereof.

### Section 8.4

Provisions for Exclusive Benefit of Bank. All conditions to the obligations of Bank to make disbursements hereunder are imposed solely and exclusively for the benefit of Bank, and its successors and assigns. No other person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Bank will refuse to make advances in the absence of strict compliance with any or all of such terms and conditions. No other person shall, under any circumstances, be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Bank at any time if, in its sole discretion, it deems advisable to do so.

### Section 8.6

Amendments, Etc. Neither this Agreement nor any provision hereof may be amended, changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

### Section 8.9

Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective heirs, successors and assigns; provided that, Borrower shall not assign the Commitment or Borrower's rights hereunder, in whole or in part, without the prior written consent of the Bank, and any such assignment without said consent shall be void and of no effect.

On or about September 30, 2005, the bank notified the contractor of the financing contract and that the proceeds of the loan, together with "additional monies that Mr. McKenzie currently has on deposit are more than sufficient to satisfy the contract price" of the construction contract. Thereafter, the contractor submitted monthly applications for payment to the debtor, seeking payment for the work completed during the previous month. The debtor deducted a 10% retainage from each

6

such progress payment. During the period from the beginning of construction in 2006 through March 9, 2007, the debtor forwarded the applications for payment to the bank and, after inspecting and approving the work, the bank made advances to the debtor's construction checking account, with certain exceptions such as change orders. The total amount advanced in response to the applications for payment as of March 9, 2007, was $4,639,991.00, which was the full amount of the Term Promissory Note executed by the debtor.

Early in the performance of the construction contract, the contractor began experiencing financial difficulty. Some time prior to August 17, 2006, the contractor assigned its rights under the construction contract, including the right to payment, to the plaintiff. On that date, the contractor instructed the debtor in writing to make all further payments under the construction contract to its surety, the plaintiff. The contractor's application for payment no. 18, issued on February 7, 2007, reflects that the total amount of retainage withheld from the progress payments through January 31, 2007 (excluding retainage amounts with respect to change orders not funded by the bank), was $488,025.40. The contractor's license expired on January 31, 2007.

Beginning in early 2007, Steven McKenzie and his associated companies, including the debtor, began having financial difficulties. The loans to the debtor, Mr. McKenzie, and his associated companies were transferred to the Special Assets Division of the bank due to a material adverse change in condition and an increased likelihood of defaults. In March of 2007, several loans associated with these entities reached their maturity without full payment, placing these entities in default of their obligations to the bank. These loans included the loan to the debtor pursuant to the financing contract and two loans to Mr. McKenzie, the guarantor of the debtor's indebtedness to the bank, in the aggregate principal amount of $7.6 million. Although the bank attempted to work with the debtor

and Mr. McKenzie on their various outstanding obligations by executing various maturity date extension agreements, including extensions of the debtor's Term Promissory Note and increasing the loan amount in June of 2007, the debtor and Mr. McKenzie ultimately never cured these defaults.

On April 23, 2007, the contractor submitted its 20th application for payment to the debtor, seeking a progress payment in the amount of $98,648.45 for 100% completion of the work required under the construction contract, except for two allowance items remaining to be completed at a charge of $5,800, and the "canopy" for the building remaining to be completed at a charge of $3,350. The application for payment indicated that the debtor had accrued "multiage" in the amount of $566,078.02 (inclusive of change order work). On April 30, 2007, the debtor's architect certified, on the application for payment, that "the Work has progressed as indicated" and "the Contractor is entitled to payment of the AMOUNT CERTIFIED."

With regard to the June 2007 amendment of the financing contract, the amount of the loan was increased by $622,000 and the maturity date was extended for six months. The loan approval form issued in connection with the extension included the following language:

> As of 04-16-07, the building was 100% complete and the Borrowers had obtained their certificate of occupancy with tenants beginning to move in the building. The additional proceeds of $622M will fund the required retainage paying the contractor in-full, which will avoid the filing of any potential liens on our collateral.

An "Amendment to Loan Documents" was signed on June 20, 2007, effective as of March 12, 2007. Paragraph 3 of the document provides:

> Default. This Amendment is not and shall not be construed to be a waiver of Events of Default or breaches by Borrower under the Loan Agreement or any Loan Documents, and no waiver shall be implied from any omission by Bank to take action on account of such defaults, Events of Default or breaches. Neither the extension of the normal maturity date of the Term Loan nor the execution of this Amendment shall in any manner waive, cancel or modify such rights or constitute an agreement to

8

forbear or a waiver of any of the Bank's rights or remedies under the Loan Documents.

Paragraph 7 of the document provides:

<u>No Waiver</u>. The execution of this Amendment by Bank and the extension of the maturity date is not intended nor shall it be construed as an actual or implied waiver of: (i) any default under any Loan Document, (ii) any requirement under any Loan Document, (iii) any right to demand payment or accelerate maturity contained in any Loan Document, or (iv) any rights Bank may have against any person not a party hereto.

Paragraph 8 of the document provides:

<u>Integration</u>. It is mutually agreed by and between the parties hereto that (i) this Amendment shall become a part of the Loan Documents by reference, and (ii) nothing herein contained shall impair the security now held for the indebtedness evidenced by the Term Note, nor waive, annul, vary or affect any provision, condition, covenant or agreement contained in any of the Loan Documents, except as herein amended. Furthermore, Bank does hereby reserve all rights and remedies it may have against all parties that may hereafter become secondarily liable for the repayment of the indebtedness evidenced by the Term Note.

On the date of execution of the Amendment to Loan Documents, the bank processed the debtor's draw on the line of credit in the amount of $116,009.83, by distributing $10,000 to itself as a "loan fee," $7,361.38 to its attorneys as an attorney's fee and closing costs, and $98,648.45 to the debtor's construction checking account.

From September 2007, the debtor failed to keep current the amounts due under the Term Promissory Note. Specifically, on September 12, 2007, the debtor did not pay off the construction loan and it also missed the $30,884.33 interest payment due thereunder on that date. On September 17, 2007, the bank's Victoria Docauer issued an "Amendment/Exception Form" regarding the McKenzie Financial Center project to other bank officials, in which she stated: "Special Assets is recommending a 90-day extension of this construction financing, including availability of $499,027.64, to December 12, 2007. This will allow time for final advances to be made and

9

permanent financing closed." In her recommendations, Ms. Docauer advised bank officials: "The building is now essentially complete and occupied by SAM [Steven A. McKenzie] and Athens Federal. However, McKenzie has a punch list for the contractor and has held up a final draw until those items have been resolved." Various bank officials "signed off" on the Amendment/Exception Form.

On November 7, 2007, Ms. Docauer acknowledged the bank's receipt of the debtor's "final draw request" under the financing contract and, in her response to the debtor, she did not note or observe any deficiencies in the "final draw request." However, she did initiate a series of electronic mail messages to and from the debtor, acknowledging the bank's receipt of the debtor's "final draw request." On that date, the debtor's line of credit with the bank under the financing contract had a balance of $499,027.64 available to fund the debtor's final draw request. On November 12, 2007, the construction project inspector appointed by the bank pursuant to the financing contract issued a report to the bank in which he (A) acknowledged his receipt of "Pay Requests #21 and #22 Combined in the amount of $569,428.02", (B) confirmed his inspection of the construction project site on that date, (C) noted that the construction project was substantially complete, (D) ascertained and reported that the office building was "in use," and (E) approved and recommended distribution of "Pay Requests #21 and #22 Combined" in the amount of $566,413.02, which was exactly 10% of all payments previously made under the construction contract (including payments for change order work).

On and after November 13, 2007, the bank informed the debtor that several things must occur prior to final disbursement, including (i) the debtor's acknowledgment that its "punch list" had been completed, (ii) the debtor's deposit of approximately $71,000 into its construction checking

10

account, that sum representing the approximate amount by which the "final draw request" exceeded the line of credit remaining at the bank, and which was necessary in order "completely pay the contractor," and (iii) the debtor's payment of two monthly interest charges that were past due under the financing contract. The debtor did not satisfy those conditions before December 12, 2007, when the debtor's obligation to repay the principal amount of the construction loan matured. In addition, the "notice of completion" required by Section 3.3 of the financing contract was never filed. The debtor failed to repay the principal amount of the construction loan when it became due on December 12, 2007. On that date, the bank offset the debtor's remaining line of credit under the financing contract, in the amount of $499,027.64, against the debtor's obligation to repay the bank the principal amount of the construction loan.

On December 15, 2008, the plaintiff, as "assignee" of the contractor's payment rights under the construction contract, obtained a judgment against the debtor in the Chancery Court of Bradley County, Tennessee, for the unpaid balance of the fee owed under the completed construction contract, in the amount of $575,228.02 (inclusive of change order charges and the charges for completed allowances).

On December 20, 2008, the debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code. The plaintiff then initiated this adversary proceeding against the bank. After multiple amendments, the plaintiff now claims that it is the assignee of a third party beneficiary (the contractor) of the financing contract between the bank and the debtor. According to the plaintiff, the bank breached that financing contract by failing to pay out the retainage to the debtor.

The parties contend there are no genuine issues of material fact to be decided in this proceeding and that the court should decide this case based upon the cross-motions for summary judgment.

## II.

Three major issues are raised in this proceeding. The first is whether the plaintiff's predecessor in interest qualifies as an intended third party beneficiary of the construction financing contract between the bank and the debtor. Second, if third party beneficiary status exists, the court must determine whether the bank breached the contract with the debtor. Third, if third party beneficiary status exists and a breach occurred, the court must decide whether the plaintiff is barred from any recovery under Section 62-6-103 of the Tennessee Code Annotated and case law interpreting it because the contractor's license expired before construction was completed.

Tennessee law governs the issues in this proceeding. When applying state law, a federal court must "'follow the decisions of the state's highest court when that court has addressed the relevant issue.'" *City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496, 502 (6th Cir. 2010) (quoting *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008)). If the issue has not been directly addressed by the state court, the federal court must attempt to ascertain how the relevant state's highest court would rule in the case. *Id.* at 502. Often, it is a difficult task to ascertain how the state's highest court might rule on an issue, especially where the issue has led to mixed results in other jurisdictions.[1]

---

[1] For example, whether a contractor can obtain the rights of a third party beneficiary in a construction financing agreement between the owner/developer and its construction lender is an issue that has met with different results in various jurisdictions. *Compare Morse/Diesel, Inc. v. First Wis. Nat'l Bank*, 952 F.2d 403 (6th Cir. 1992) (unreported table decision), *available at* 1992 WL 6101, at *2 (applying Michigan law and finding that contractor was not direct beneficiary of construction loan contract), *with Clardy v. Barco Constr. Co.*, 208 A.2d 793 (Pa. Super. Ct. 1965) (contractor was third party creditor beneficiary of lending contract). As for why some courts recognize third party beneficiary status in construction financing agreements and some do not, one commentator has noted
(continued...)

12

With regard to the third party beneficiary issue, Tennessee courts generally presume that contracts are executed for the benefit of the parties to the contract and not for the sake or advantage of third parties. However, a litigant may overcome this presumption by showing "'(1) a valid contract made upon sufficient consideration between the principal parties and (2) the clear intent to have the contract operate for the benefit of a third party.'" *Owner-Operator Indep. Drivers Ass'n, Inc. v. Concord EFS, Inc.*, 59 S.W.3d 63, 68-69 (Tenn. 2001) (quoting *First Tenn. Bank Nat'l Ass'n v. Thoroughbred Motor Cars, Inc.*, 932 S.W.2d 928, 930 (Tenn. Ct. App. 1996)).

In this proceeding, the parties have offered several arguments supporting their respective positions on whether or not the contractor was an intended third party beneficiary of the retainage provision in the financing contract. In general, the plaintiff points to several parts of the record and argues that the evidence supports a conclusion that the retainage provision in the financing contract was intended by the contracting parties to benefit the contractor, while the bank points to other parts of the record and argues that the evidence supports a conclusion that the retainage provision in the financing contract was intended to benefit the bank Unfortunately, there are no third party beneficiary cases from Tennessee courts that address the type of contract at issue here. Rather than decide how a Tennessee state court might rule on the third party beneficiary issue presented here, the dispute between the parties can easily be decided by considering only the second issue raised in this proceeding. This is so because, even assuming the plaintiff were a third party beneficiary of the financing contract, its contractual claims against the bank would fail.

---

[1] (...continued)
that "[t]here are really no rational grounds for reconciling the cases denying recovery with those granting it").1 Alvin L. Arnold & Marshall Tracht, *Construction & Development Financing* § 4:244 (3d ed. 2008).

13

## III.

A third party beneficiary claim is often a limited source of recovery for the third party because the promisor can raise the same defenses against the third party beneficiary that it could raise against the promisee. *Benton v. Vanderbilt Univ.*, 137 S.W.3d 614, 619 (Tenn. 2004) ("the rights of a third-party beneficiary are subject to any limitations imposed by the terms of the contract"); 3 Philip L. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor on Construction Law* § 8:107 ("[I]f the owner is in default under the construction loan agreement, the lender may defend the contractor's claim by arguing that the owner's default has relieved it of any additional payment obligation."); Mark Brody, *The Rights of Subcontractors and Contractors to Recover Against Lenders*, 2 Ann. Rev. Banking L. 281, 298-99 (1983) ("A third party beneficiary claim is a limited source of recovery because the promisor can raise the same defenses against an intended beneficiary as it could against the promisee. . . . Thus, if a borrower defaults, a third party beneficiary subcontractor is not entitled to recover on any claim that accrues thereafter."). In this proceeding, the record is clear that, even if the plaintiff were the successor in interest to a third party beneficiary, it would not be entitled to recover against the bank under the terms of the contract.

At the hearing on the cross-motions for summary judgment, the plaintiff's counsel conceded that the debtor had not complied with various conditions precedent to final disbursement of the loan proceeds in this case, and the debtor failed to repay the construction loan at maturity. For example, the record shows, and counsel conceded, that the debtor never filed a Notice of Completion that was required by the contract[2] and, when the loan reached the maturity date on December 12, 2007, the

---

[2] In order to be protected from lien claims that have not previously been recorded as provided in Section 66-11-111 or 66-11-112 of the Tennessee Code Annotated, Section 66-11-143 provides that an owner of improved real property may record in the county office of the register of deeds a notice of completion of the improvement. The statute sets forth the requirements regarding the notice
(continued...)

debtor failed to pay it. The debtor also did not satisfy several other conditions, namely, acknowledging that its "punch list" had been completed, depositing approximately $71,000 into its construction checking account to make up the difference between the "final draw request" and the line of credit remaining at the bank, and failing to pay two monthly interest charges that were past due under the financing contract. Morever, the record also shows that the debtor failed to cure defaults in its various other loans to the bank, which constituted an event of default with respect to the construction financing agreement and, although the bank amended the construction loan after these defaults, the amendment to the construction loan contained explicit provisions stating that the bank did not waive any of the prior defaults.

Recognizing that the debtor had not satisfied all conditions that were necessary before the bank was contractually obligated to fund the "final draw request," and before the loan maturity date, the plaintiff's attorney made a new argument during the hearing on the motions. Counsel reiterated an argument presented in his brief that Section 8.19 of the construction financing contract, which grants the bank setoff rights in loan funds and deposits, should not be construed to apply to retainage funds, and he offered a new, alternative argument that Section 8.19 should be stricken from the contract on public policy grounds. Neither contention, however, is convincing.

Section 8.19 is broadly worded to apply to "any and all deposits (general or special, matured or unmatured, including, but not limited to, the construction checking account with the Bank for this loan) and credits of the Borrower against the Bank, at any time existing." Nothing on the face of this provision exempts undisbursed retainage funds from other "credits of the Borrower against the Bank." In essence, the plaintiff wants to treat the undisbursed loan funds as if they were actually dis-

---

[2] (...continued)
of completion and the rights of the owner and lien claimants resulting from compliance with the statute.

15

bursed and placed in a separate trust account in favor of the contractor, thereby rendering Section 8.19 inapplicable. But those are not the facts of this case. Since the bank never released or disbursed any of the retainage funds (let alone into an escrow, trust, or retainage account for the contractor's benefit), the funds remained as "credits of the Borrower against the Bank" to which Section 8.19 applies.[3]

Nor does a public policy exception mandate that the court strike this provision. As an initial matter, striking Section 8.19 alone would serve no purpose, since the plaintiff's recovery would still be barred by other contractual provisions (such as conditions to disbursement) that operate as defenses for the bank. Counsel for the plaintiff acknowledged as much at the hearing and argues that the public policy exception should invalidate virtually all contractual defenses except a contractor's failure to complete construction (at least with respect to retainage funds). Thus, according to the plaintiff, the bank had an obligation to disburse the loan funds no matter what the contract said and no matter how egregious the debtor's own defaults.

To support this argument, the plaintiff points to the public policy embodied in Section 66-11-144(a) of the Tennessee Code Annotated[4], which requires the use of an escrow account when "a certain amount or percentage of the contract price is held *by the owner or contractor*" (emphasis added). The bank, however, is neither the owner nor the contractor. An "owner" is defined to include "any person having any right, title, or interest, legal or equitable, in real property, which may be sold

---

[3] The court also notes that the plaintiff filed a Third Amended Complaint on August 13, 2010, and, during a hearing on that date, counsel for the plaintiff acknowledged that his client had withdrawn its theory that the retainage funds were or should be treated as being held in trust for the contractor. To the extent that the plaintiff is now attempting to make a trust theory argument, such an argument, which was expressly abandoned, will not be permitted.

[4] Nothing in the contract requires the escrowing of the retainage, but the plaintiff argues that the requirements of Section 66-11-144(a) were an implied part of the agreement.

16

under process." Tenn. Code Ann. § 66-11-101(11). Although the bank had a lien on the real property, such interests are not among those real property interests "which may be sold under process." *See Anco Supply Co. v. Wilkes*, 1986 WL 10149 (Tenn. Ct. App. Sept. 19, 1986) (trustee under deed of trustee was not "owner" under Section 66-11-101; rather mortgagor was owner).[5] This interpretation of the statute is confirmed by subsequent changes in Tennessee law, which moved these retainage requirements to a chapter that expressly exempts banks from its scope. Tenn. Code Ann. § 66-34-703. Therefore, the bank is not subject to the provisions of Section 66-11-144(a), and no public policy supports the striking of the contract provisions between the debtor and the bank.[6]

Additionally, the Tennessee Supreme Court has explicitly admonished courts not to permit this type of contractual "cherry-picking" by putative beneficiaries. Instead, such parties step into the shoes of their benefactors and can assert no greater rights than those available under the contract. *Benton v. Vanderbilt Univ.*, 137 at 618. Here, the debtor failed to meet the conditions precedent to a loan disbursement for a variety of reasons. Since the terms of the contract would preclude the debt-

---

[5] Despite differences in statutory definitions of "owner," courts in other states have held the same: a mortgagee or trustee under a deed of trust is not an "owner" for purposes of a mechanic's lien statute. *Red Rooster Constr. Co. v. River Assoc., Inc.*, 620 A.2d 118, 121-23 (Conn. 1993); *R.L. Sweet Lumber Co. v. E.L. Lane, Inc.*, 513 S.W.2d 365, 368-71 (Mo. 1974); 5 Herbert T. Tiffany & Basil Jones, *Tiffany Real Property* § 1577; Maurice T. Brunner, *Who Is the Owner Within Mechanic's Lien Statute Requiring Notice of Claim*, 76 A.L.R.3d 605 (1977).

[6] The bank argues that the retainage provision in the financing contract was imposed upon the debtor by the bank for the bank's benefit. By restricting the use of loan proceeds and holding back 10% of the loan funds, the bank shielded itself from several financial risks: the misallocation of loan proceeds, the failure of the debtor to comply with all conditions of the loan, and the risk of default by the debtor. The bank argues that it was up to the debtor, not the bank, to create its own retainage account pursuant to Section 66-11-144(a). The court agrees. Because the statute does not apply to the bank, the bank was free to set up its own retainage subject to the contractual terms in the contract. As noted earlier, the court finds it unnecessary to determine whether the contractor should be deemed a third party beneficiary of this retainage but, even if it were, the contractor would still be bound by the other conditions and provisions in the contract.

or from obtaining a disbursement, an asserted third party beneficiary can succeed to no greater rights.

## IV.

In light of the above holding, the court need not address the bank's affirmative defense premised upon the contractor's failure to maintain a contractor's license through the last stages of construction. *See* Tenn. Code Ann. § 62-6-103(b); *Kyle v. Williams*, 98 S.W.3d 661 (Tenn. 2003).

## V.

In sum, the court concludes that the plaintiff cannot recover because the debtor's non-performance under the financing contract precludes the plaintiff from forcing the bank to disburse more funds, and the bank was within its rights to offset the debtor's remaining line of credit against the debtor's obligation to repay the bank upon maturity of the financing loan. Public policy does not require the court to alter the contractual terms agreed to by the parties. Accordingly, the court will enter a separate order denying the motion for summary judgment filed by Western Surety and granting the motion for summary judgment filed by Regions Bank.

###